## Affidavit Of Patrick Dorsey

I, Patrick Dorsey, on oath depose and state that:

1.    I am a Special Agent with the Drug Enforcement Administration ("DEA") and I have been so employed for approximately seven years.  Prior to that, I was employed as a police officer in Tallahassee, Florida for approximately eight years.  During the course of my career, I have received specialized narcotics training from DEA and I have been involved in numerous narcotics investigations at the federal and state levels involving a number of investigative techniques, including electronic surveillance (wiretaps), consensually-recorded conversations, physical surveillances, pen registers, and the use of confidential informants and cooperating witnesses.  During my career, I have become familiar with the various ways in which drug dealers import, transport, store, and distribute narcotics.

2.    I am involved in a DEA investigation of narcotics trafficking by **Mark A. McArdle**, whose date of birth is August 26, 1968 and who currently resides at 255 Proctor Avenue in Revere, Massachusetts with his girlfriend, Jill Sasso.  The information contained in this affidavit is based on my personal knowledge gained through my involvement in the investigation as well as from information provided to me from other DEA agents, state and local police officers, cooperating witnesses, and public records. I am submitting this affidavit for two reasons.  The first reason is for the limited purpose of demonstrating probable cause to believe that McArdle has committed the crimes listed in the complaint, namely conspiracy to distribute marijuana, attempted possession of marijuana with intent to distribute, conspiracy to distribute cocaine, attempted distribution of cocaine, and distribution of cocaine.  The second reason is in support of an application for the issuance of a search warrant authorizing the search of 255 Proctor Avenue, Revere, MA.  Accordingly, I have not set forth all of the facts that I have learned during this investigation.

3.    I have obtained a printout of McArdle's prior criminal history from the Massachusetts Criminal History Systems Board. The printout reveals that McArdle has a juvenile and adult criminal history in Massachusetts dating back to 1984 (age 16). In November 1988, McArdle was convicted in the Jury-Of-Six Session of the Peabody District Court of the felony offenses of breaking and entering in the night time, wanton destruction of property, possession of burglarious tools, assault and battery on a police officer, and attempted larceny; he was sentenced to one year in the House of Correction, suspended for one year.

4.   I have obtained reports from the Revere Police Department, which reports reveal that, in December 1998, McArdle was arrested by the Revere Police Department for shooting a man named Richard Zelandi, the owner of a Revere bar named Zeke's Lounge, in the wrist and head and that Zelandi, who knew McArdle, initially told police that he had been shot after he refused McArdle's demands for money.  McArdle was charged in the Chelsea District Court with armed assault with intent to murder and assault and battery by means of a dangerous weapon but the case was dismissed in April 1999 when Zelandi refused to cooperate in the prosecution.

5.   Beginning in the fall of 2000, other DEA agents and I received information from a cooperating witness ("CW") that McArdle was involved in the distribution of cocaine, oxycodone, and marijuana.[1]  The CW stated that McArdle was heavily involved in the marijuana business and that he had sources of supply who sold him marijuana at $800 per pound.  The CW also stated that the CW met McArdle in or about 1999, that McArdle stated he was involved in selling cocaine and marijuana and in smuggling large quantities of oxycodone pills out of Mexico, and that McArdle approached the CW about providing McArdle with alternate sources of supply for marijuana.

## Marijuana Conspiracy/Attempted PWID

6.   In January 2001, while working with DEA, the CW contacted McArdle and indicated that the CW had connections with Mexican marijuana traffickers who were transporting a large load of marijuana from the West Coast to the Massachusetts area.  As set forth more fully below, beginning on January 17, 2001, the CW (and later an undercover DEA agent) had numerous in-person meetings with McArdle primarily at four different Dunkin' Donuts restaurants in Saugus and Somerville wherein McArdle negotiated to purchase 400 pounds of marijuana from the undercover agent. All of these meetings were surveilled and recorded by DEA; surveillance photographs were taken of several meetings and there is a surveillance videotape of one meeting inside an undercover apartment in Somerville.  During this portion of the investigation, it was determined that McArdle was then residing

---

[1] The CW had previously been involved in the distribution of cocaine and was arrested by DEA in August 2000 while in the process of selling a half-kilogram of heroin to another DEA cooperating witness.  The CW thereafter began providing information and working proactively with DEA in the hope of earning a reduced sentence.

in a rented condominium located at 171 Shore Drive in Winthrop.

7.    At the first meeting with the CW on January 17, 2001,[2] McArdle stated that he had "a grass thing going in Florida" and that he was obtaining marijuana for $750 per pound from his Florida source.  McArdle also stated that he was obtaining "kilos" of cocaine for $19,000-$20,000 per kilogram.[3]  The CW stated that he had connections to Mexican marijuana traffickers on the West Coast, that 700 pounds of marijuana were "coming up" to Massachusetts in the near future, that 200 pounds were already promised to somebody else, and that 500 pounds were available. The CW stated that the price would be negotiable but that McArdle probably could get the marijuana for $650 per pound.  McArdle stated that he would buy as many pounds as he could get at that price.

8.    At a second meeting on January 24, 2001,[4] McArdle asked what was going on with the CW's "guys" and the CW replied that everything was "fine" and that the marijuana should be in Massachusetts by early February.  McArdle stated that he would be willing to purchase 400 pounds.  After some negotiation, McArdle agreed to pay $700 per pound ($280,000).  After speaking further about oxycodone smuggling, McArdle asked the CW if the CW could obtain some "white stuff" (cocaine) for McArdle.  The CW stated that he could not.

---

[2]  Surveillance agents observed McArdle arrive at this meeting in a 2001 Cadillac DHS that was registered to him. Records revealed that McArdle purchased this automobile from Frost Motors in Newton in September 2000, that it cost over $51,000, that McArdle paid over $27,000 in money orders and cashier's checks, and that he obtained financing from GMAC for the balance.

[3]  McArdle also stated that he was involved in smuggling oxycodone pills into the United States from Tijuana, Mexico and that he "lost $165,000 worth of oxy's" when his associate was arrested at the San Diego Airport.  McArdle spoke about his involvement in the smuggling and distribution of oxycodone pills in subsequent meetings with the CW.

[4]  Surveillance agents observed McArdle arrive at this meeting in a Ford F-150 extended cab pick-up truck that was registered to him.  This meeting was photographed.

3

9.    At a third meeting on January 29, 2001, McArdle asked the CW how are things and whether "that thing" was coming through.  The CW replied that the CW's associates were enroute. The CW also stated that "they" were going to want full payment ($280,000) at the time of the sale.  McArdle replied that coming out with $280,000 in cash did not look right and that nobody did business that way.  McArdle proposed that he be fronted 50 pounds of marijuana over time and that he return over time with partial payments until the 400 pounds was sold, indicating that this was a less risky way of doing business.  This issue was left open.

10.    At a fourth meeting on January 30, 2001,[5] McArdle and the CW negotiated over the manner in which payment would be made. The CW eventually stated that the "guys" would "cuff" McArdle half (200 pounds) if McArdle paid $140,000 up front for the first half (200 pounds) and that McArdle could come back with the second payment after he sold the marijuana.  McArdle stated that he had to "see" (inspect) the marijuana before he would be willing to do this.

11.    At a fifth meeting on February 1, 2001 in Somerville, McArdle met with the CW, who introduced McArdle to two DEA undercover agents, who portrayed themselves as associates of the Mexican marijuana traffickers.  The agents brought McArdle to the back of a pick-up truck and showed him several bales of marijuana inside a duffel bag.  After McArdle indicated that he wanted to "see" (inspect) the marijuana, all four persons entered a nearby undercover apartment.  Once inside, a bale of marijuana was opened and McArdle observed, handled, and smelled the marijuana to assure himself that the quality was good.  After stating to one of the undercover agents that the marijuana was "good," McArdle asked "what kind of arrangements do you want to work out now?"  McArdle and one of the undercover agents ("UCA") then engaged in negotiations over how much money McArdle could pay up front.  It was eventually agreed that McArdle needed five days to collect the money from his customers and that they would do the deal in five days.  After leaving the undercover apartment, McArdle told the CW that the marijuana was "good stuff" and that "I'm very happy."  This entire sequence of events, both outside and inside the undercover apartment, was surveilled, taped, photographed, and videotaped.

_____

    [5]  Surveillance agents observed McArdle arrive at this meeting in a 2000 Mercury Mountaineer SUV that was leased to McArdle.  Ford Motor Company credit records revealed that McArdle used money orders to make the monthly payments.

4

12.  After this meeting, DEA surveillance agents followed
McArdle as he drove his Cadillac to a Dunkin' Donuts restaurant
in East Boston.  Once there, McArdle met with an associate and
then stood in front of a bakery and had a series of meetings with
at least six unidentified males.  It appeared as though McArdle
was meeting with his customers.  These events were surveilled and
photographed.  After these events, McArdle contacted the CW by
telephone and had an unrecorded conversation indicating that he
was ready to make the purchase and that he could pay half
($140,000) up front.  A meeting was set up for the next day.

13.  On the afternoon of February 2, 2001, McArdle met with
the UCA and the CW at a Dunkin' Donuts restaurant in Somerville.
Prior to this meeting, surveillance agents observed a series of
meetings among McArdle and two associates in Everett, Revere, and
McArdle's residence in Winthrop.  The upshot of this was that
McArdle and his two associates traveled in three separate
vehicles to the vicinity of the sale location.  All three circled
the area, stopping and conversing with each other at one point.
It appeared as though McArdle and his associates were engaging in
counter-surveillance and/or were looking for the undercover
apartment.

14. When McArdle finally showed up at this sixth meeting,
he stated that he needed to do "some more collecting" and that he
had $60,000 but that he needed to get another $90,000 from two
more guys.  McArdle stated that he would be ready to do the deal
in 2-3 days and that he would have the other half of the money
($140,000) five days after that.  McArdle told the UCA that "I do
want to do business with you" and that, if this deal was
successful, he wanted to do business every month.  McArdle
explained that "all my money" was "tied up right now" with "those
fucking oxy's in Mexico" (oxycodone pills) but that he could
probably purchase 600 pounds of marijuana per month in the
future.  The meeting broke up after the UCA declined McArdle's
request to front him 100 pounds, with payment to be made the next
day.

15.  At a seventh meeting on February 5, 2001, McArdle told
the CW that he had a "bad feeling" about the undercover agents,
indicating that he was concerned they were going to rip him off
for the money.  While the CW vouched for the agents, McArdle
expressed reservations about the manner in which he had been
allowed to inspect the marijuana on February 1.  McArdle then
stated that he wanted to "rip those guys off" and that he and his
buddies would show up at the next meeting with a handgun and
handcuffs.  McArdle offered to give the CW $100,000 after he
obtained and sold the marijuana.  The CW attempted to dissuade

McArdle from this plan, expressing concern for the CW's own
safety from the Mexican marijuana traffickers on the West Coast.

16.  At an eighth meeting on February 14, 2001, McArdle
expounded upon his plan to rob the agents, telling the CW that he
could either (1) locate and steal the pick-up truck containing
the marijuana or (2) rob and handcuff the agents during the deal.
At one point, McArdle asked whether the CW would mind if the
agents "disappeared" (were killed) and the CW replied that that
would be a bad idea because the Mexicans would find the CW.
McArdle also recounted that he had robbed a drug dealer of
$75,000 earlier that day by using a fake moustache and a police
badge to gain entry into the dealer's home and then by using a
handgun and a stun gun on the dealer to ascertain the location of
the cash.[6]  At DEA's request, the CW stated that he was having
trouble collecting $10,000 from the sale of some of the marijuana
brought up by the undercover agents.  McArdle promptly
volunteered to get the money for the CW, stating that he likes
doing things like that.

17.  At a ninth meeting on February 20, 2001, McArdle asked
the CW whether "those guys are coming back or what" (the CW had
previously told McArdle that the undercover agents had
distributed the earlier load and had gone back to the West
Coast).  The CW indicated that the agents should be returning
soon with another load of marijuana.  After speaking briefly
about his rip-off plan, McArdle asked whether the CW could get
him a kilogram of cocaine, stating that it was too risky for him
to get one from his source in Florida.  The CW replied that he
would try to help McArdle but that he wasn't doing that right
now.

18.  At a tenth meeting on February 27, 2001, the CW told
McArdle that the undercover agents should be back in
Massachusetts in 2-3 weeks.  McArdle then discussed his plan to
rip off the agents.  McArdle again asked whether the CW could get
him a kilogram of cocaine.  The CW stated that the CW knew of a
source who was charging $31,000 per kilogram and McArdle replied
that that price was "crazy" and urged the CW to get a lower price
for him.  McArdle mentioned that he was flying to Florida to pick
up cocaine, stating that he paid $19,000 per kilogram in

---

[6]  Other DEA agents and I were unable to verify this account
through local police departments.

6

Florida.[7]

19.  At an 11th meeting on March 12, 2001, McArdle asked
the CW "what's up with the marijuana thing?"  The CW replied that
"they" would need McArdle to send $50,000 to the West Coast
before they would deliver any marijuana to him here.  McArdle
scoffed at that "crazy" notion and remarked that he should have
shot the undercover agents when they were showing him the
marijuana.  McArdle stated that he would be getting some cocaine
and marijuana from Florida and he asked the CW to get some "cut"
for him.

20.  At a 12th meeting on March 16, 2001, the CW told
McArdle that "they" would be returning to Massachusetts with
another 700 pounds of marijuana but that "they" would want the
money first.  McArdle quizzed the CW on whether the CW would know
where the marijuana would be kept, stating that he would take it
from them.  McArdle also mentioned that he had traveled to
Florida to get cocaine but that it was bad quality so he did not
get any.  McArdle also stated that he had previously obtained
marijuana through Federal Express packages mailed to him.

21.  At a 13th meeting on March 29, 2001, McArdle met with
the UCA and the CW at the Kelly's Roast Beef restaurant on Route
One in Saugus.  They spoke about the earlier failed deal and
McArdle attributed the failure to "a little misunderstanding"
about how the money was to be paid.  They negotiated a new
transaction, with the UCA stating that he had 1500 pounds of
marijuana in New York and with McArdle stating that he could take
the "same as last time" (400 pounds).  While negotiating price
and quality, McArdle stated that he had purchased 200 pounds of
marijuana two weeks earlier at $650 per pound, that the marijuana
had come up from Texas, and that only half of it was of good
quality so he had to "mix" the good quality with the poor quality
in order to sell it.  During the negotiations, McArdle stated
that "I don't like to give money up front, that's no way to do
business" but he eventually agreed to consider making a down
payment of $50,000.  McArdle stated that he was selling the
"white stuff" (cocaine) in order to make the money.

22.  At the March 29 meeting, McArdle stated that he was
flying that night to Florida to check out some "white" (cocaine),
adding that he was paying $20,000 per kilogram for multiple

---

[7]As set forth more fully below, McArdle sold the CW a
handgun with an obliterated serial number during this meeting.

kilograms. McArdle stated that he had a friend whom he paid
$5,000 to drive the cocaine from Florida to Massachusetts.
McArdle stated that he had previously done his share of driving
drugs from Texas to Massachusetts and from Florida to
Massachusetts and that he had previously flown with "suitcases
full of marijuana" from California to Massachusetts. McArdle
stated that he was never stopped but that his friend was arrested
once with 105 pounds of marijuana and was incarcerated for three
months.

23. Based on McArdle's comments, DEA agents and local
police in Orlando, Florida were present when McArdle disembarked
at the Orlando airport from a Southwest Airlines flight that
originated in Manchester, NH. The flight arrived in Orlando at
11:00 p.m. on March 29, 2001. McArdle had purchased a one-way
ticket. The agents observed that a Florida resident named Damian
Suchma was waiting to pick up McArdle. During an interdiction
stop, McArdle and Suchma gave inconsistent stories about
McArdle's visit to Orlando. After a drug dog alerted on
McArdle's suitcase, the agents obtained a state search warrant,
opened the suitcase, and recovered five one-pound bags of
marijuana secreted inside the suitcase. The agents also
recovered over $8,000 in cash from McArdle and over $4,000 in
cash from Suchma.[8] McArdle was arrested on state narcotics
charges. On September 18, 2001, McArdle pleaded guilty and he
was sentenced to five years' probation. In December 2001,
McArdle's probation supervision was transferred to the Suffolk
Superior Court and he is currently still on probation, according
to the printout from the Massachusetts Criminal History Systems
Board.

24. At a 14th meeting on April 2, 2001, McArdle met with
the UCA and the CW and negotiated extensively with the UCA for a
future purchase of 400 pounds of marijuana. The sticking point
was McArdle's down payment of money. McArdle stated that he was
"nervous" about fronting that much money ($50,000) because there
was a risk that the UCA would disappear with it. McArdle
explored other options, offering to front a smaller amount of
cash and his Ford F-150 pick-up truck. McArdle attempted to
reassure the UCA that he would not disappear with the marijuana,
stating that he owned a bar, giving UCA-1 a business card
identifying McArdle as the proprietor of a bar called "The Line"

---

[8] In an effort to explain the money, McArdle told the
agents that he owned a bar in Massachusetts but that he did not
know how much the bar made per month because he had owned it for
less than one year.

in Everett, and inviting UCA-1 to visit him at the bar. McArdle stated that "once we get the first time done, we are all set, we don't have to worry about it" (they'll trust each other after the first transaction). McArdle stated that he was selling "white" (cocaine) that he regularly obtained from Florida, stating that as soon as he gets it up from Florida, "I get it out because I don't like to touch it too much." When two uniformed Saugus police officers walked into the restaurant where they were meeting, McArdle stated that he hated cops and cautioned the UCA that "these guys you don't have to worry about, it's the ones without the uniforms" (detectives). Speaking about his recent trip to Florida, McArdle stated that there were a lot of undercover police and drug dogs at the airport and that he had **not** been stopped when he arrived there.

25. At the meeting on April 2, McArdle recounted a past incident in which "I walked into a bar in Revere and shot the owner in front of everybody." McArdle stated that the name of the bar was Zeke's and he laughingly stated that the case was dismissed because they had no witnesses.[9] As set forth above, McArdle was charged in December 1998 with shooting the owner of Zeke's in Revere but the case was later dismissed.

26. At the meeting on April 2, McArdle stated that he used to have marijuana transported via Federal Express packages from San Francisco to Massachusetts. McArdle went into extensive detail about how this scheme worked, explaining that he used fake business labels, that he had a Federal Express employee in on the scheme, and that he paid the employee $500 per shipment. McArdle offered to do it for the UCA in the future.

27. At a 15th meeting on April 4, 2001, McArdle again engaged in extensive marijuana negotiations with the UCA. McArdle eventually stated that he could not come up with any front money right now because all of his money was tied up in the "white" (cocaine) and that "that's what I do to make money." They explored various options for doing a marijuana deal, with McArdle stating that it would only take him 10 days to sell 400 pounds of marijuana and return the money to the UCA and again offering to use his vehicle as collateral. At one point, McArdle offered to allow the UCA to store the marijuana inside his bar. McArdle again offered to assist the UCA in shipping marijuana via Federal Express packages.

_____

[9] During this portion of the story, the UCA asked McArdle if he had a gun. McArdle replied, "yeah, always."

28.  At a 16th meeting on April 17, 2001, McArdle told the
CW that he would not front $75,000 for the marijuana because he
had been losing money and he did not want to lose any more money.
McArdle offered to assist the CW in using the Federal Express
scheme to ship cocaine from Florida, stating that he would give
the CW the right box and label.  McArdle also admitted to the CW
that he had been stopped in Florida and that he suspected that
somebody was talking.  In follow-up meetings on April 19 and 20,
McArdle explained in detail how the Federal Express scheme worked
and he took the CW to a Staples, where he prepared a Federal
Express airbill and told the CW always to use overnight priority
mail and a medium-sized box because a kilogram weighs about two
pounds.

29.  At various recorded meetings with the UCA after May
2001, McArdle made references to the fact that he was still
involved in the marijuana business.  At a recorded and surveilled
meeting on January 24, 2003, for example, McArdle stated that he
had recently gone to Canada and spoken to an associate about
obtaining high-quality marijuana from British Columbia ("BC
Bud").  McArdle stated that this marijuana would cost him $2,500
per pound but that he could sell it for $5,000 per pound.
McArdle stated that he was going to send one of his friends to
Canada the following week to make arrangements to obtain some of
this marijuana.

### McArdle's Sale Of A Handgun

30.  At the meeting on February 20, 2001, at DEA's request,
the CW asked McArdle whether he could get the CW a handgun,
stating that the CW wanted it for self-protection.  McArdle
replied that he could get the CW as many guns as he wanted and as
many kinds as he wanted, quoting a price of $200 per gun.

31.  At the meeting on February 27, 2001, McArdle met with
the CW at a Dunkin' Donuts restaurant on Route One in Saugus and
then drove the CW to a nearby car wash.  As they were going
through the car wash, McArdle reached under the driver's seat and
pulled out a plastic bag containing a loaded Glock, Model 26,
nine millimeter semi-automatic pistol bearing an obliterated
serial number.  McArdle gave the handgun to the CW in exchange
for $200 in cash.  This transaction was recorded and surveilled
by DEA and ATF agents.  After the sale, the firearm was turned
over to ATF, which successfully test-fired the weapon but which
was unable to restore the serial number.

32.  At the meeting on March 12, 2001, the CW and McArdle
spoke about the handgun.  At the meeting on March 15, 2001,

10

McArdle stated that he could get the CW two more handguns at the same price ($200 per handgun).

## McArdle's Involvement In The Distribution Of Oxycodone

33.   At the first meeting on January 17, 2001, McArdle told the CW that he "lost $165,000 worth of oxy's" (oxycodone pills) when his associate got arrested at the San Diego airport about a month and a half earlier.  McArdle further stated that his associate was still in jail in California as the bail was set at $250,000.  In subsequent meetings, McArdle stated that his associate had messed up at the airport and that he was told what to do but that he had not followed instructions.

34.   DEA agents subsequently determined that, on the morning of November 20, 2000, a Revere resident named James Hickey was detained by security personnel at the San Diego airport as he attempted to get a large quantity of oxycodone pills through the security checkpoint.  Local police officers and DEA Task Force Agents responded and placed Hickey under arrest on state narcotics charges.  Hickey had over 7,000 forty-milligram oxycodone pills secreted in his bags and taped to his body.  Hickey was flying on Southwest Airlines from San Diego to Manchester, NH but he did not have his ticket with him.  The agents determined that he was flying on a cash, one-way ticket with an associate of McArdle who also lives in Revere.  The associate was paged off of the plane and questioned by the agents.  The associate admitted that he was traveling with Hickey and he had Hickey's ticket as well as claim checks for two suitcases (one for Hickey and one for the associate) in his possession.  The associate told the agents that he and Hickey were vacationing in San Diego, that they had visited Tijuana, and that Hickey had separated from him while they were in Tijuana.  The associate denied any knowledge of the oxycodone pills and he was allowed to re-board the plane.

35.   During a change of planes in Nashville, TN, the associate was approached by DEA agents and he made similar statements to them.  The associate gave consent to a search of his suitcase and the agents observed a roll of clear packing tape similar to the tape used to attach the bags of pills to Hickey's body.

36.   I am aware that Hickey was charged in the San Diego Superior Court with narcotics offenses and he was held in lieu of bail.  According to the court records, he pleaded guilty on March 5, 2001 and he was sentenced on April 5, 2001 to 14 years in state prison.

37. I am aware that, on the afternoon of January 20, 2001, another associate of McArdle was stopped by Customs inspectors as he was crossing the border from Tijuana, Mexico into San Ysidro, California.[10] This associate was selected for secondary inspection as he was observed to be extremely nervous and shaking very badly. During the inspection, the inspectors recovered bags of pills (totaling 3,000) taped to his legs. Believing that the pills were Viagra, the inspectors confiscated the pills, imposed a fine against the male, and released him. Customs subsequently realized that the pills were oxycodone (twenty-milligram)and a subsequent DEA laboratory analysis has confirmed that they are oxycodone pills.

38. At his meeting with the CW on January 24, 2001, McArdle stated that he had not been able to obtain any "oxy's" from his source in Tijuana. McArdle also stated that he had not told his source about the incident at the San Diego airport (the arrest of Hickey) because the "Tijuana guys" would never deal with him again if they found out about it.

39. At his meeting with the UCA and the CW on February 2, 2001, McArdle stated that he had to collect more money from others and that all his money was "tied up right now" with "those fucking oxy's in Mexico." At his meeting with the CW on February 5, 2001, McArdle reiterated that his money was tied up in San Diego with the "oxy's."

40. At his meeting with the CW on February 19, 2001, McArdle received a text message on his Motorola Talk-About device and then told the CW that the message was from his guy out on the West Coast. McArdle stated that his guy was bringing in "oxy's" from out there and that the "oxy's" were hidden inside a golf club bag. Based on this information, DEA agents determined that an associate of McArdle (the same person who had been with Hickey in San Diego in November 2000) was flying that night from San Diego to Manchester, NH on a Southwest Airlines flight. The ticket was one-way and purchased with cash. During a change of planes in Kansas City, this associate was approached by DEA agents, who conducted an interview and searched his bag but did not recover any contraband.

41. At his meeting with the CW on February 27, 2001, McArdle stated that he was expecting to receive some "oxy's" the next day or the day after and that they were coming from Mexico

---

[10]This is the same person who was waiting to pick up McArdle at the airport in Orlando, Florida in late March 2001.

City.  At his meeting with the CW on March 16, 2001, however,
McArdle stated that he was not getting any more "oxy's" from
Mexico because the Mexican government was getting strict.

42.  At his meeting with the UCA and the CW on April 2,
2001, McArdle stated that he and his friends go to pharmacies in
Tijuana to obtain "oxycodones."  McArdle explained to the UCA
that "oxycodones" were like "percocets" but with a stronger
dosage.  McArdle stated that he purchased forty-milligram
oxycodone pills for approximately $7.00 per pill and that he sold
them for $17.00 per pill.  McArdle stated, however, that he did
not have any pills at that time.  At his meeting with the CW on
April 17, 2001, McArdle stated that it was getting tough to get
"oxy's" but that he had a new connection in Tijuana and that his
supply should be getting better.  At his meeting with the CW on
April 20, 2001, however, McArdle stated that he did not have any
oxycodone pills for sale and that he had not received any in
quite some time.  McArdle repeated this statement during his
meeting with the CW on May 4, 2001.

43.  At a recorded and surveilled meeting with the UCA on
July 9, 2002, McArdle stated that he had not been dealing with
oxycodone pills for about a year but that he would attempt to
contact his guy in Mexico to get them for the UCA.  McArdle told
the UCA that he and his associates used to carry them across the
border on their persons, that he obtained different strengths
(10's, 20's, 40's, and 80's), and that he used to purchase at
least 5,000 pills at a time.

### Cocaine Conspiracy/Attempted Distribution

44.  As mentioned above, the CW knew McArdle to have been
involved in cocaine distribution and, at various times in 2001,
McArdle stated to the CW and/or the UCA that he was distributing
large quantities of "white" (cocaine) that he received from a
source in Florida.  In 2002, the UCA approached McArdle in order
to enlist his assistance in having kilograms of "cocaine" shipped
from the UCA's "associates" on the West Coast to Massachusetts,
where the "cocaine" was to be distributed by the UCA.  In 2001,
McArdle had told the CW and the UCA that he had a Federal Express
driver who could assist in this form of shipment.

First Fedex Delivery Of Sham Cocaine

45.  On February 14, 2002, the UCA called McArdle and
arranged to meet him at a Dunkin' Donuts restaurant in

Somerville.  At the ensuing meeting,[11] McArdle stated that he had
been "laying low" because he had been stopped by DEA at a Florida
airport in March 2001, that he had gone to Florida to pick up
some "white stuff" (cocaine), that DEA had searched his bag with
a warrant, and that they had to let him go because they did not
find any drugs (which was false).  McArdle stated that he had
been very careful and that he had stopped dealing the "white" and
the "oxy's" because he did not want to take any chances and end
up in jail, adding "that's what happens when you get greedy."
The UCA stated that he was distributing some "white" in the
Boston and New York areas and he asked whether McArdle could help
him transport kilograms from the West Coast to Massachusetts via
Federal Express.  McArdle agreed to do so and stated that he
would contact his Federal Express driver to let him know.
McArdle stated that the driver would know that the package would
contain drugs and that the UCA would have to pay McArdle $1,000,
$500 for the driver and $500 for McArdle.  McArdle instructed the
UCA to get him names and addresses of computer companies in Los
Angeles and he would make up shipping labels for the UCA, adding
that it was less suspicious if it appeared as if the package was
coming from a business.[12]  The next day, the UCA called McArdle
and gave him the names and addresses of four computer companies
in Los Angeles.

    46.  On February 20, 2002, the UCA met with McArdle, who
provided computer-generated airbills, Federal Express labels, and
two Federal Express boxes.[13]  After showing the UCA how to affix
the labels to the boxes, McArdle used his cellular telephone to
call his Federal Express driver to ask if the driver had "that"
(an address to send the packages).  McArdle then used a nearby
pay phone to call the driver again.  After this conversation,
McArdle handed the UCA a piece of paper containing the following
address: Webs R Us at 8 Newbury Street in Boston.  McArdle stated
that the UCA's associates could send the package to that address
and he provided instructions for whoever was doing the shipping
(send the package from a Mailboxes, Etc., pay in cash, dress like
a businessman).  McArdle stated that the UCA's associates could

_____

    [11]This meeting was recorded and surveilled by DEA.

    [12]At one point, the UCA stated that he was charging $20,000
for a kilogram.  McArdle immediately expressed an interest in
purchasing 1-2 kilograms, stating that he had Dominican friends
who could sell the cocaine for him.

    [13]This meeting was recorded, photographed, and surveilled by
DEA.

send a package every day but he declined the UCA's request to meet the Federal Express driver, stating that the driver was a family man and did not want to meet anyone.

47.    Other DEA agents and I coordinated with Federal Express security personnel to prepare and ship a package containing a kilogram of sham cocaine from Los Angeles to the Newbury Street address.  On February 27, 2002, the UCA met with McArdle, who spoke in detail about the anticipated shipment and who made arrangements to meet the UCA on Newbury Street when the package arrived on March 1, 2002.[14]  During this meeting, McArdle spoke in detail about the ways in which he had previously transported drugs, speaking about transporting "green" (marijuana) by airplane (up to 60 pounds) and automobile (up to 400 pounds) years ago.  McArdle showed the UCA his Motorola Talk-About device, vouched for its ability not to be wiretapped, and stated that he used to communicate every day with the doctor in Mexico when he was distributing the "oxy's" (oxycodone pills).  After the meeting, McArdle called the UCA and stated that he had just talked to the driver, who had confirmed that the package would arrive in Boston on March 1.

48.    On the morning of March 1, 2002, the UCA had unrecorded telephone conversations with McArdle confirming a meeting at 10:00 a.m. at a Starbucks coffee shop at 350 Newbury Street in Boston.  During these conversations, McArdle stated that he had spoken with the Federal Express driver, who had stated that he was running a little late but that he would have the package. Surveillance agents followed a Federal Express driver as he drove his delivery truck from the South Boston warehouse to various locations in Back Bay.  At 9:18 a.m., the driver electronically reported to Federal Express that he had delivered the package. Agents, however, were able to observe the package sitting on the back of the truck after that time.  Shortly before 10:00 a.m., while the driver was parked near 46 Newbury Street (Brooks Brothers), agents observed him meet with, and hand the package to, a male.  Agents then observed this male drive to and enter a hair salon on Newbury Street.  Shortly thereafter, agents observed McArdle arrive in his Dodge Ram pick-up truck and the male exit the salon and transfer the package to McArdle.  McArdle then drove to and parked on Boylston Street and walked to his meeting with the UCA while carrying the package.  All of these events were observed and photographed by surveillance agents.

_____

[14]This meeting was recorded and surveilled by DEA.

49.  After meeting with the UCA inside the Starbucks,
McArdle and the UCA walked together to the UCA's car so that the
UCA could confirm that the "cocaine" was in the package.[15]  At
the car, the UCA placed the package inside the trunk, opened the
package, showed the "cocaine" to McArdle, and stated that he was
satisfied.  As the UCA prepared to give McArdle $1,000 in cash,
McArdle expressed concern about doing that on the street.
Accordingly, they sat in the UCA's car and made the exchange.
During the exchange, McArdle stated that the UCA's associates
could send 2-3 kilograms the next time.  The UCA then gave
McArdle a ride to his truck.

Second Fedex Delivery Of Sham Cocaine

50.  On March 11, 2002, the UCA met with McArdle, who spoke
in detail about doing future similar transactions, stating that
the UCA's associates could send up to 10 packages per week
without any problems and that they could send 2-3 kilograms per
package.[16]  The UCA and McArdle spoke in detail about another
shipment, with McArdle stating that the package could be sent to
the same address on Newbury Street.  McArdle also expressed an
interest in purchasing one kilogram of cocaine from the UCA.
After this meeting, DEA agents and Federal Express security
personnel prepared and shipped another package containing two
kilograms of sham cocaine from Los Angeles to Boston.  The UCA
made arrangements to meet with McArdle at the same Starbucks on
March 15 in order to receive the package.

51.  On March 15, 2002, DEA surveillance agents again
observed the Federal Express driver transfer the package to the
same male on Newbury Street after he indicated to Federal Express
that he had delivered the package.  On this occasion, however,
McArdle parked his truck in the public alley behind a hair salon.
The male then carried the package from his automobile (which was
parked on Newbury Street) through the salon and out the back door
to McArdle.  McArdle and the male then drove together out to
Newbury Street, where McArdle parked nearby.  The male returned
to the hair salon while McArdle carried the package to the UCA at
Starbucks.[17]  During his meeting with the UCA, McArdle stated
that he had a hard time parking and that a friend who owned a

_____

[15]These events were recorded, photographed, and surveilled
by DEA agents.

[16]This meeting was recorded and surveilled by DEA.

[17]These events were surveilled and photographed by DEA.

16

nearby shop was taking care of his truck.  McArdle and the UCA
again walked to the UCA's car, where the UCA placed the package
inside the trunk, opened the package, showed the "cocaine" to
McArdle and stated that he was satisfied.  During the walk, the
UCA passed to McArdle an envelope containing $1,000 in cash.[18]
After leaving the UCA, McArdle was observed to walk to, and have
a meeting with, the male in front of the hair salon.  The male
then handed a set of keys to McArdle, who walked to his truck and
drove away.

### Recorded Statements By McArdle In 2002 And 2003

52.  On March 28, 2002, McArdle met with the UCA and had an
extensive discussion about the prior Federal Express deliveries
and about future cocaine deliveries for the UCA.  McArdle again
expressed an interest in purchasing a kilogram of cocaine from
the UCA in order to get his cocaine business started again,
adding that once his business got going, he would be willing to
purchase at least one kilogram per week.[19]

53.  On July 9, 2002, McArdle met with the UCA and had an
extensive discussion about future cocaine deliveries.  McArdle
again stated that he wanted to purchase one kilogram for the time
being but that he would purchase multiple kilograms on a weekly
basis in the future.[20]

### Distribution Of Cocaine - 2003.

54.  On January 24, 2003, McArdle met with the UCA,[21] who
asked whether McArdle was still selling cocaine.  McArdle stated
that he was still actively selling ounces of cocaine, that he
purchased up to a half-kilogram at a time from his source, that
he broke down the half-kilogram into ounces, and that he sold the
ounces to his customers.  The UCA stated that he needed to
purchase one ounce of cocaine and McArdle agreed to sell him one
for $900 the following week.

---

[18]These events were recorded, surveilled, and photographed
by DEA.

[19]This meeting was recorded and surveilled by DEA.

[20]This meeting was recorded and surveilled by DEA.

[21]This meeting was recorded and surveilled by DEA.

55.   On January 31, 2003, McArdle met with the UCA in
Watertown.[22]  During a short drive in the UCA's car, McArdle sold
the UCA one ounce (27.8 grams) of cocaine for $900.  During this
transaction, McArdle spoke about his regular source of supply as
well as a new source with whom he hoped to do business.  McArdle
agreed to sell kilograms to the UCA in the future.

### Recent Developments

56.   In 2003 and 2004, I determined that McArdle was no
longer living in Winthrop but rather that he was now living at
255 Proctor Avenue in Revere with his girlfriend, Jill Sasso.   I
also learned that he was now working for Keyspan.  According to
Keyspan security personnel, McArdle was living at 255 Proctor
Avenue in Revere.  McArdle also used this address in registering
a vehicle and a boat trailer with the Registry of Motor Vehicles.
According to the Massachusetts Electric Company, the subscriber
of electricity at 255 Proctor Avenue is JILL SASSO.

57.   On February 10, 2004, the UCA met with McArdle at a
Dunkin' Donuts restaurant in Somerville.[23]  DEA surveillance
agents and the UCA observed McArdle arrive at the meeting in a
white Keyspan van.  During the meeting, McArdle stated that he
had been purchasing two kilograms of cocaine every month and that
he was breaking up the kilograms and selling them by the ounce.
McArdle agreed to sell the UCA an ounce as a sample for $800.
McArdle stated that the UCA still could have kilograms of cocaine
shipped in Federal Express packages without a problem, that he
would check with his friend who works for Federal Express, and
that the fee still would be $1,000.  McArdle went on to state
that there was a great demand in the Boston area for cocaine and
marijuana, that "people in Boston are starving for the green
stuff" (marijuana), and that McArdle could easily sell 300-400
pounds of marijuana to business owners in the Boston area.
McArdle also stated that he had been selling OxyContin pills,[24]
that he buys 1,000 80mg. OxyContin pills approximately every two
weeks, and that he could sell the UCA OxyContin pills at $42.00
per pill.

---

[22]This meeting was recorded, surveilled, and photographed by
DEA.

[23]This meeting was recorded and surveilled by DEA.

[24]I am aware that OxyContin is a brand name for oxycodone
pills.

18

58.  At about 4:55 p.m. on February 19, 2004, I observed the same Keyspan van that McArdle was operating on February 10 parked in front of 255 Proctor Avenue in Revere.

59.  On February 25, 2004, the UCA met with McArdle at a Dunkin' Donuts restaurant in Somerville.[25]  On this occasion, McArdle arrived at the meeting in a 2002 black Dodge 1500 pick-up truck that, according to Registry records, is leased by Chase Manhattan Automotive Finance Corporation to McArdle at 255 Proctor Avenue in Revere.  McArdle stated that he did not have the ounce of cocaine to sell to the UCA because he had it previously but that he did not like the quality and he was supposed to get another one but that he had not heard from his source.  The UCA express an interest in having kilograms of cocaine shipped in Federal Express packages and McArdle stated that he would speak to his friend at Federal Express and get addresses so that he could make the labels.

60.  On February 27, 2004, McArdle called the UCA's cellular telephone and left a voice-mail message that he had spoken to his friend and had obtained an address in Boston to which the package could be shipped.  McArdle asked the UCA to speak to his associates in California and get addresses for at least two hair salon addresses in California so that McArdle could create the labels for the package.

61.  On March 1, 2004, the UCA called McArdle and gave him the names and addresses of two hair salons in the Los Angeles, California area.

62.  On March 2, 2004, the UCA made arrangements to meet with McArdle that night at a Dunkin' Donuts restaurant in Somerville.  Prior to the meeting, at about 5:35 p.m., I observed the same Keyspan van as McArdle was operating on February 10 parked at 255 Proctor Avenue in Revere.  At about 6:10 p.m. on March 2, I observed McArdle enter the van and drive away.  At about 8:00 p.m., driving the same Keyspan van, McArdle arrived at the meeting with the UCA.  During this meeting, the UCA and McArdle spoke about the upcoming shipment of kilograms of cocaine and McArdle handed the UCA a manilla envelope containing labels, indicating that the hair salon businesses in Los Angeles were shipping something to a hair salon on Newbury Street in Boston.

63.  After the meeting, DEA surveillance agents followed McArdle as he drove back to 255 Proctor Avenue in Revere.  At

---

[25]This meeting was recorded and surveilled by DEA agents.

about 2:00 a.m. on March 3, 2004, a Revere police officer drove by the residence and observed a Keyspan van parked there. After the meeting on March 2, other DEA agents and Federal Express security personnel prepared a shipment of sham cocaine and mailed it via Federal Express from California to Boston. The package is due to arrive in Boston on the morning of March 10 and McArdle has agreed to meet with the UCA on Newbury Street in Boston in order to transfer the package to him.

64. At approximately 6:45 a.m. on March 10, 2004, I observed the same Keyspan van that McArdle was operating on February 10 parked in front of 255 Proctor Avenue in Revere.

65. On March 10, 2004, at approximately 8:06 a.m. Federal Express security advised me that the package had arrived at the Federal Express hub in Boston, MA. At approximately 10:20 a.m., agents saw Tasso Lazarides of Salon Xenofon arrive and go into the salon at 228 Newbury Street in Boston. A short time later he came out, and drove two blocks up the street and approached the Federal Express driver in his truck. I then saw the driver give Lazarides the package. Lazarides then got back in his car and parked on Marlboro Street and walked back to Salon Xenofon with the package.

66. At approximately 12:15 p.m., agents saw McArdle arrive in the KeySpan truck. McArdle parked in the alley behind 228 Newbury Street and went to the back door of Salon Xenofon where he met Lazarides, who had the package in his hands. After a brief discussion, McArdle and Lazarides got into the KeySpan van. At approximately 12:35 p.m., agents arrested McArdle as he sat in the van with Lazarides in the alley behind 228 Newbury Street. The package with the sham cocaine was in the van.

## Authority for Search Warrant

67. Based on the foregoing, I believe there is probable cause to believe that Mark McArdle is engaged in the ongoing business of trafficking narcotics, including but not limited to cocaine, and that he operates out of 255 Proctor Avenue, Revere, MA. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for individuals who distribute controlled substances to maintain, in a fixed location from where they operate, records relating to their drug trafficking activities.

68.  Because individuals who distribute controlled substances in many instances will "front" (that is, sell on consignment) drugs to their clients, or alternatively, will be "fronted" drugs from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often individuals who distribute controlled substances keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") by the trafficker's suppliers and the trafficker's dealers.  Additionally, individuals who distribute controlled substances must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

69.  Based upon my training and experience, I am also aware that it is a common practice for distributors of controlled substances to conceal sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.  In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  These types of evidence would typically be maintained in a location where the drug trafficker would have quick, secure, and easy access, such as the trafficker's residence.

70.  Individuals who distribute controlled substances often stay in contact with their customers and suppliers using cellular telephone equipment.  Bills and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence or business location and will confirm prior contacts with suppliers and customers. Here, that equipment is likely to be anywhere inside 255 Proctor Avenue, Revere, MA.

71.  During the course of residential and commercial searches, agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

21

72.  My awareness of these trafficking practices, arise from
my own involvement in prior drug investigations and searches
during my career as a law enforcement officer, my involvement on
a number of occasions in debriefing confidential informants and
cooperating individuals in prior investigations, as well as what
other law enforcement agents and officers have advised me when
relating the substance of their similar debriefings and the
results of their own drug investigations, and other information
provided through law enforcement channels.

## Items To Be Seized

73.  Based upon all of the information I have obtained
during the course of this investigation, and for the reasons more
specifically set forth above, I submit that there is probable
cause to believe that evidence regarding illegal drug activities
will be found in 255 Proctor Avenue, Revere, MA.  More
specifically, I submit that there is probable cause to believe
that the following items of evidence will be found in the subject
premises:

1.  Books, records, notes, ledgers, and any other papers or
    records relating to the purchase, transportation,
    shipment, ordering, sale, importation, manufacture,
    and/or distribution of controlled substances and/or
    firearms, including but not limited to Federal Express
    airbills and receipts, and/or records relating to the
    receipt, disposition, and/or laundering of proceeds
    from the distribution of narcotics, including but not
    limited to cocaine, marijuana, and/or Oxycontin, and/or
    records or electronic devices reflecting the identity
    of co-conspirators and drug customers, as well as their
    addresses, telephone, and pager numbers.  Such
    documents include, but are not limited to, telephone
    address books, planners, receipts, state and federal
    income tax returns and supporting paperwork, notes,
    ledgers, bank records, money orders, wire transfers,
    cashier's checks, passbooks, certificates of deposit,
    bills, vehicle rental receipts, credit card receipts,
    hotel receipts, meal receipts, travel agency vouchers,
    travel schedules, shipment records, telephone bills
    and/or toll records and bills.

2.  Cash and currency, and other items of value made or
    derived from trafficking in narcotics, including but
    not limited to cocaine, marijuana, and/or OxyContin,
    and documents related thereto,  Such items include, but
    are not limited to titles, deeds, monetary notes,

22

registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

3.    Documents reflecting dominion and/or control of 255 Proctor Avenue, Revere, MA, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

4.    Documents or tangible evidence reflecting dominion, ownership, and/or control by Mark McArdle over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.    Photographs of individuals, property, and/or illegal controlled substances.

### Description of Property To Be Searched

74.    The subject property is described as follows:

255 Proctor Avenue, Revere, MA, is the right side of a two-family, three-story residence located at the corner of Proctor Avenue and Blaney Street.  The building is light grey in color with grey trim.  There are two doors, light brown in color, on the front of the building.  The number "255" is affixed in black above the door to the right (if facing the building), which is the doorway to 255 Proctor Street, which is occupied by Mark McArdle and his girlfriend, JILL SASSO.  The number "257" is affixed in black above the door to the left (if facing the building), which is the doorway to 257 Proctor Avenue, which is occupied by GEORGE and JEAN SASSO, the parents of JILL SASSO (the requested search warrant does not include 257 Proctor Avenue).  There is an open porch at the front of the building with an approximate three foot iron rail.  There is a driveway to the right of the building (if facing the building).

## Conclusion

75.  Based on the foregoing, I believe that there is probable cause to believe that Mark A. McArdle knowingly and intentionally committed the following crimes: conspiracy to distribute marijuana from in or about January 2001 to in or about March 2001, attempted possession of marijuana with intent to distribute in February 2001, conspiracy to distribute cocaine from in or about February 2002 to in or about March 2002, attempted distribution of cocaine on or about March 1, 2002 and on or about March 15, 2002, and distribution of cocaine on or about January 31, 2003.

76.  Based upon the foregoing, and based upon my training and experience, I also submit that there is probable cause to believe that the premises located at 255 Proctor Avenue, Revere, MA, which are more specifically described above, presently contain the items set forth above, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of 21 U.S.C. §§ 846 & 841(a)(1). Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in 255 Proctor Avenue, Revere, MA.

Patrick Dorsey
Special Agent, DEA

Sworn to and subscribed before me this 10th day of March 2004.

JUDITH GAIL DEIN
United States Magistrate Judge
Boston, Massachusetts

24