```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) CRIMINAL NO. |
| V. | ) 04-10129-RCL |
| | ) |
| MARK MCARDLE, | ) |
| Defendant | ) |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States of America hereby submits its Memorandum in regard to the sentence of Mark McArdle. McArdle was a longtime, significant drug trafficker, participating in separate conspiracies for marijuana, oxycodone, and cocaine. McArdle's sentencing memorandum argues that he was essentially a minor player who bragged his way into trouble with DEA. The facts show that that is simply not the case. He was a longterm drug dealer, who by his own admission moved "two keys [kilograms] of coke a month and a few hundred pounds of weed on a regular basis," and this "new high living lifestyle went on for five years." McArdle's handwritten submission to the Court, page 2. McArdle bragged about his access to guns, to drugs, and to violent men, because for five years his "new high living lifestyle" had provided exactly such access. The government therefore respectfully submits that the Court should sentence McArdle commensurate with the real gun-selling, drug dealing felon who actively and aggressively participated in the conduct in the 12 counts charged, and not with the fictionalized victim of agent aggression that defendant's memorandum attempts to depict.

**Outline of Conduct**

<u>Marijuana Conspiracy</u>

The investigation of Mark McArdle began in the fall of 2000 when a cooperating defendant in an unrelated case provided information that McArdle was involved in the distribution of marijuana and oxycodone. The cooperating defendant worked proactively with DEA and became a cooperating witness ("CW").

Beginning in January 2001, the CW had recorded meetings and telephone conversations with McArdle in which the CW stated that he had a connection to a Mexican marijuana organization and that he could get large amounts of high-grade marijuana for McArdle to purchase. The CW introduced McArdle to an undercover agent ("UCA"), who portrayed himself as a representative of a Mexican drug organization based on the West Coast and who had numerous recorded meetings with McArdle concerning McArdle's purchase of marijuana from the organization. McArdle met with the CW on January 17, 2001 (PSR ¶7). At that meeting the CW stated that his colleagues (the undercover agents that the CW was going to introduce to McArdle) had 700 pounds of marijuana coming up from Florida. The CW told McArdle that 200 pounds of this were committed, but that the remainder was available. The CW stated that he thought McArdle might be able to get the marijuana for $650 per pound. McArdle told the CW that he would take as much as he could get for $650 per pound.

The Defendant's revised sentencing memorandum asserts that the CW offered to sell McArdle 400 pounds of marijuana. Defendant emphatically asserts that the quantity was a quantity proposed by the CW and the UCA.  This is false.  During the January 17, 2001 meeting, the CW made it clear that an open-ended quantity was available: a truck was coming with 700 pounds of which 200 were committed and 500 were available.  On January 24, 2001, the CW and McArdle met again.  At this time, the CW told McArdle he thought McArdle could buy at $700 per pound. The CW asked McArdle how much McArdle would want at that price.  McArdle reported that he would 400 pounds at the $700 price.  The tapes are clear that this amount was proposed by McArdle, not the agents, and not the CW.

McArdle reported to the CW on January 17, 2001, in the first meeting, that he had cash flow problems.  He further explained that he had lost $165,000 of oxycontin pills about a month and a half previous.  DEA has determined that on November 20, 2000, James Hickey, an associate of McArdle, had 7,717 40 mg oxycontin pills seized from him at the San Diego airport.  The street value of oxycontin at that time, based on Hickey's statements as well as DEA knowledge and experience, was a dollar per milligram. Therefore, the pills seized from Hickey were worth approximately $308,680 in street value.

Three days after this meeting, another McArdle associate, co-defendant Damien Suchma, was stopped crossing the border from Tijuana with about three thousand OxyContin twenty milligram pills taped to his legs.  These pills would have a street value of about $60,000.  On February 2, 2001, McArdle told the UCA that he had trouble coming up with money at this time because "See, I have all those f**king Oxy's in Mexico, that's where I have all my money tied up right now."  McArdle nonetheless told the UCA that he wished to do the deal as soon as he collected more of the cash that he needed, and that afterward "I can probably do 600 a month," referring to 600 pounds a month.

In DEA surveillance connected with the February 2, 2001 meeting with the UCA, DEA agents observed McArdle and two associates doing countersurveillance, and the DEA lead investigator instructed the UCA that he was concerned about the potential of a "rip" and that the UCA be cautious and should not go anywhere with the target.  On the basis of these concerns, DEA terminated the sting, and no further meetings with the UCA occurred.  (Subsequent to his arrest, McArdle confirmed to DEA that he and his colleagues were looking for the UCA's truck and were planning to steal the marijuana.)

Although there were no further meetings with the UC, there were numerous further meetings with the CW.  In each of those meetings, McArdle made it clear that he wanted to get the

marijuana that was under discussion, most likely by stealing it. In a meeting on February 5, 2001, McArdle told the CW that he wanted to "rip these guys off," referring to the UCA, and McArdle asked the CW if it would be ok.  McArdle offered the CW money as part of such a deal, stating that his own money was still tied up with the Oxys in Mexico.  On February 14, McArdle again told the CW that he would like to rip off the Mexicans (the UCA).  He described various ways he could do this, including handcuffing the Mexicans and the CW (in order to make it look like the CW was not in on it) or simply making them disappear.  In a subsequent meeting, on February 19, 2001, McArdle again said that he would like the UCA to disappear.  The discussion took place at a public area, and stopped when strangers sat down at the table next to the CW and McArdle.  McArdle then changed the topic to OxyContin and cocaine, asking the CW to get him a kilogram of cocaine.

<u>Gun Enhancement</u>

During the negotiations, McArdle made various statements to the CW about possessing and/or using guns.  At DEA's request, the CW told McArdle that he was experiencing problems with a drug associate or customer and that he might need a handgun for self-protection in his drug business.  McArdle offered to sell a handgun to the CW.  On February 27, 2001, McArdle sold a loaded handgun bearing an obliterated serial number to the CW.  We did

not charge a violation of 18/924(c) but we are using this sale to obtain a 2-level enhancement under the drug guideline. This enhancement is disputed by McArdle.

McArdle agreed to sell the CW a gun at a time that McArdle was still actively soliciting the CW to set up the meeting with the UC regarding the marijuana and at a time when McArdle was asking the CW to use his sources to obtain kilogram quantities of cocaine. This clearly supports a 2 level gun enhancement under 2K2.1 of the Sentencing Guidelines. In United States v. Thompson, 32 F.3d 1, 8 (1st Cir. 1994), the First Circuit affirmed a finding that a firearm sale to an informant was in facilitation of a drug transaction within the meaning of 2K12.1 even though the seller of the firearm had had no personal involvement in selling drugs to the informant, and even though the drug transaction was on a separate day from any drug transactions. Thompson was not charged with any drug offenses. He was simply charged with possessing a weapon with an obliterated serial number, which is the same offense with which McArdle is charged.[1] The defendant in Thompson argued that the usual case in which the §2K2.1 cross-reference is used to apply drug guidelines to a firearms offender is where the defendant used a firearm for protection during a drug transaction or had

---

[1] McArdle is also charged with being a felon in possession.

the firearm available to protect his supply of drugs.  The Court responded:

> While this may be the most common scenario, it is certainly not the only type of situation. Rather, the cross-reference has been applied in a variety of factual scenarios where a firearm has somehow aided or facilitated the cross-referenced offense. *See, e.g.,* United States v. Patterson, 947 F.2d 635, 636 (2d Cir.1991) (finding that the district court properly applied § 2K2.1(c)(2) enhancement when evidence showed that defendant had a gun under the front seat of his car while he was driving to purchase drugs, even though no drugs were physically present in the car.) Here, the requisite nexus existed by virtue of the fact that the enterprise, which Thompson was associated with, sold the guns and drugs together, in an attempt to accommodate a customer and maintain his business.

32 F.3d at 8.  Here, like in Thompson, the record shows that McArdle was selling a gun to a drug connection in order to "accommodate" a cohort and "maintain his confidence and business."  Id.  Accordingly, the Court should find that the gun enhancement applies.

### Double Jeopardy

Defendant argues that the gun enhancement would subject defendant to double jeopardy.  This argument is specious.  Defendant could have been charged under 18 USC 924 (c).  That statute requires a mandatory on and after sentence, in addition to the sentence for the underlying drug crime.  If defendnat had

been charged with 924(c) and subjected to the mandatory minimum sentence for that crime, the government would agree that he should not then also receive an enhancement on his separate drug sentence for the same conduct.

However, defendant was not charged with 924(c). He was charged with being a felon in possession of a firearm, which has nothing to do with whether the firearm was used to facilitate a drug crime. He was also charged with having a weapon with an obliterated serial number. This charge likewise has nothing to do with whether the weapon was used in a drug crime. Accordingly, the enhancement for using the weapon in a drug crime is not double counting, much less double jeopardy, and the government respectfully submits that it should be imposed.

**Sentencing Factor Manipulation**

McArdle asserts that the Court should find sentencing factor manipulation in regard to the amount of marijuana and cocaine involved in the 400 pound marijuana negotiation and in the packages of sham cocaine. This argument has no merit on the facts of the transactions or on the facts of McArdle's life.

On the facts of the transactions, the tape recordings and agent reports are clear that McArdle was the one to set the amounts involved in the reverse operations, not the agents or the cooperator. In the marijuana operation, the CW told McArdle that

the load was 700 pounds and of that 200 was committed. He then asked McArdle how much he wanted. McArdle stated he wanted 400 pounds. The government is prepared to play the tape of this meeting at the sentencing hearing in order to resolve any doubt the Court may have on this issue.

Likewise, on the question of the sham cocaine, McArdle initiated conversation regarding the amount of cocaine, and he actually volunteered that they could ship *more* than they actually shipped. The initial sham transaction was for 1 kilogram. After that was successfully transferred, McArdle volunteered to the undercover agent on March 1, 2002 (PSR at 64) that they could ship two or three kilograms in the next transaction. McArdle subsequently told the UC (PSR 65) that they could send up to 10 packages per week of 2-3 kilograms per package. Far from manipulating the sentencing factors, DEA arranged for only a two kilogram package to be sent in response to this in March 2002. A final package was shipped, of two kilograms, in 2004. This package made a total of 5 kilograms. A five kilogram conspiracy would trigger a mandatory minimum sentence of ten years. However, the prosecutor charged the conspiracy only for the conduct in 2002. The facts here show evidence of tremendous restraint, not aggressiveness, on behalf of the investigators and the prosecution, in the face of a defendant who has shown overwhelming predisposition. This is not sentencing factor

manipulation, and defendant's argument on this point should be wholly rejected.

Rehabilitation

Defendant argues that he had rehabilitated himself prior to his involvement with the CW. This is simply not supported by the record. Defendant was by his own admission a highliving drug dealer, dealing in large quantities of oxycontin, cocaine, marijuana, and guns. To the extent that he had cut back on his drug dealing during his time with the cooperating witness, it was because his sources had dried up and his cohorts had been arrested, not because he had lost interest in being a drug dealer. McArdle tried actively to get the CW to get him drugs – of any kind. McArdle asserts that he was rehabilitated through his honest work. However, during the final delivery of sham cocaine in March 2004, McArdle drove his Keyspan vehicle to the deal. See PSR at 82.

Conclusion

The government respectfully asserts that McArdle should be sentenced in accord with the Guidelines as calculated using the factors set forth in the plea agreement, including an enhancement for the gun facilitation, without any reduction for 3553(a) factors. The government respectfully submits that the Guidelines aptly apply to this multi-drug defendant.

```
                            Respectfully submitted,

                            MICHAEL J. SULLIVAN
                            United States Attorney

                      By:   /s/ Nancy Rue
                            NANCY RUE
                            Assistant U.S. Attorneys
                            One Courthouse Way
                            Boston, MA 02210
                            (617) 748-3260
```

February 16, 2007

## CERTIFICATE OF SERVICE

    I, Nancy Rue, do hereby certify that a copy of the foregoing was served on Janice Bassil, counsel for the defendant, by ECF.

```
                            /s/ Nancy Rue
                            Nancy Rue
```

February 16, 2007